### HURLBURT v. BELLOWS.

A witness, first called by the plaintiff, was subsequently recalled by the defendant, and then gave testimony unfavorable to the plaintiff. The plaintiff, thereupon, submitted evidence to the presiding justice, tending to show that the plaintiff was surprised at the later testimony of the witness, that there was no collusion or bad faith on the plaintiff's part, and that the witness was adverse to the plaintiff. The plaintiff was then permitted to prove that the witness had previously made oath, before the plaintiff's counsel, to statements contradictory to his present testimony. *Held*, that the defendant had no ground of exception.

TRESPASS *qu. cl.*, by Azro B. Hurlburt against Charles Bellows, Thomas C. Sullivan, and John D. Mooney. The defendants, severally, pleaded the general issue. Messrs. Burns & Heywood appeared for Bellows; Mr. Whidden appeared for Sullivan and Mooney. The plaintiff offered evidence tending to show that Mooney and Sullivan entered

upon the plaintiff's lot and cut timber; and that they did this as the servants of Bellows and by his directions. From the course of the trial it might have been inferred that Mooney and Sullivan, though going through the form of defending the suit, were not unwilling that a verdict should be returned against all the defendants. Bellows introduced evidence tending to show that Mooney and Sullivan were not his servants; that he sold them the stumpage of the spruce timber on a lot adjoining the plaintiff's, and that he bought the timber of them after they had got it off.

Early in the trial, before the plaintiff had rested, the plaintiff called Leonard M. Beard, who had been summoned by the defendant Bellows. Beard, upon direct examination by the plaintiff, testified that he knew the lines of the plaintiff's lot; that Sullivan and Mooney had a camp on that lot; that the timber was cut about that time, and that he saw no one else logging there; that some of this timber was drawn to the Beard mill; and that Bellows paid the saw-bill on what was drawn to that mill. Beard was cross-examined by the defendants, and then left the stand. The plaintiff introduced other testimony, and then rested. Subsequently, while the defendants were putting in testimony, Mooney and Sullivan called Beard. After they had examined him, he was examined by Bellows. While under examination by Bellows, he testified (in contradiction to Mooney and Sullivan) that Mooney and Sullivan told him that they bought the timber of Bellows at a price agreed on for the stumpage. After Beard had given this testimony, one of the counsel for the plaintiff submitted to the court his own affidavit, in substance as follows: "I depose and say that I was induced to call L. M. Beard as a witness, because I knew of no other witness at hand who could testify to the fact that the defendants cut on lot 96; and that I called him for that reason alone, for I knew he was hostile to the plaintiff, and his attendance procured by the defendant Bellows. I also say that I am surprised at his testimony now, on the point of what Sullivan and Mooney said to him on the lot, as he had, about the time this suit was brought, told me an entirely different story." The plaintiff was then allowed to put in an affidavit, in the hand-writing of the plaintiff's counsel, subscribed and sworn to by Beard two years previous to the trial, containing the statement that Mooney and Sullivan told Beard that, while cutting, they were at work for Bellows. To the introduction of this affidavit, the defendant Bellows excepted.

The jury having returned a verdict against all the defendants, Bellows moved to set it aside.

*J. H. Benton, jr.*, for plaintiff.

The case shows that the testimony of Beard, which the plaintiff was allowed to impeach by his previous affidavit, was material and important to establish the defence of Bellows, by whose cross-examination it was elicited; and the affidavit of the plaintiff's counsel shows that Beard was called by him as a matter of necessity, and that he was surprised by his testimony.

The question at bar is, whether the presiding justice had a right to allow the plaintiff to impeach this testimony by the previous contradictory affidavit of Beard.

The objection of Bellows, as stated in the brief of his counsel, is that Beard was the plaintiff's witness, and hence he could not contradict him by any evidence not competent to prove the main fact in issue in the case.

In answer to this objection, we submit: *First.* When Beard gave this testimony he was the witness of the defendants and not of the plaintiff. What makes a witness the witness of the party calling him? If it is because he gives material testimony for that party, then, if upon direct or cross examination he gives material testimony for the other party (as in this case), is he not, *as to that testimony*, the witness of that party? If this be the criterion, then if Beard, even when upon the stand for the plaintiff, had given material testimony for Bellows, he would, as to that testimony, have been his witness; *a fortiori* then was he his witness, when he gave material testimony for him in the progress of his defence, when called by his co-defendants. If it is because the witness is presumed to be most favorable to the party calling him, which seems to be the view of some of the elementary writers (Greenleaf on Ev., vol. 1, sec. 447), then, when the witness is manifestly hostile to that party, he cannot be his witness; and the reason upon which the objection to special impeachment is based being thus removed, the objection fails, " *Cepante ratione legis, cepat lex.*" Here it is not only shown that the witness was hostile to the party calling him, but that he was under the influence and control of Bellows, by whom he was summoned and paid. Hence we submit that he could not properly be regarded as the witness of the plaintiff, even when he was first upon the stand, much less when he was called by Bellows' co-defendants, and cross-examined by him, not for the purpose of explaining any previous testimony for the plaintiff, but to make out the vital point of Bellows' defence.

There seems to be no substantial reason, aside from the two I have named, for regarding a person testifying in a cause as the witness of one party more than the other; and we submit that, even upon this view of the question, whenever a party draws from a witness an independent fact not explanatory of testimony previously given for the other side, and which makes in his favor, the party against whom the testimony makes should be allowed to impair the weight of that testimony by a special impeachment of the witness *upon that point*, for he is, as to that testimony, the witness of the party in whose favor it makes. *Jackson* v. *Son*, 2 Caines' 178; *People* v. *Moore*, 15 Wend. 423; *Philadelphia & Trenton R. R. Co.* v. *Stimpson*, 14 Peters 461; *Mattice* v. *Allen*, 33 Barb. 547; *Craig* v. *Grant*, 6 Mich. 447; *Ellmaker* v. *Buckley*, 16 Serg. & Rawle 76; Starkie on Evidence, vol. 1, p. 162.

But this assumption, that a witness is the *property* of the party calling him, is based upon what a distinguished writer has well styled " a sophism involved in the use of words." (Bentham's Rationale of Judicial Evidence, vol. 2, p. 76.) The French jurist, DUMONT, says:

" The reasoning of the English lawyers seems to me to be a sort of a grammatical error. The whole force of the argument lies in the pronoun *my*. The logic is the following: What is mine belongs to me; I can dispose at my pleasure of whatever belongs to me; my horse belongs to me, and so does my witness; just as my horse carries burdens for me, so will my witness give evidence for me." Dumont's Treatise on Judicial Evidence, 104, note. The true view is that a witness is not the property of anybody. No person has a right to say, "*This is my witness*," and no rule of evidence should be based upon so false a foundation. The testimony of each witness should be weighed for what it is worth, and all facts which tend to show what it is worth should be fairly considered. Truth has nothing to gain from the exclusion of the evidence. Bentham's Rationale of Judicial Evidence, vol. 2, pp. 60–71; Appleton on Evidence, 224; *Beebee* v. *Tinker*, 2 Root 160; Taylor on Evidence (first ed.), §§ 1044, 1049.

*Second*. The question whether Beard, in giving this testimony, was the witness of the defendant, was one of *fact*—properly decided by the presiding justice, whose decision thereon is not open to revision. The situation of the witness, his appearance on the stand, his relations to the parties, and all the circumstances showing whether he was more favorable to one side of the case than to the other, were peculiarly within the knowledge and observation of the justice at the trial term, and his decision was not only correct and proper upon the facts, but was made in the exercise of what is termed " a sound legal discretion," and, as no question of discretion is reserved, cannot be open to re-examination. Greenleaf on Evidence, sec. 447, vol. 1; *Commonwealth* v. *Porter*, 10 Metcalf 286; *State* v. *Ledford*, 6 Iredell 5; *Clayton* v. *Anthony*, 6 Rand. (Va.) 285; *Moody* v. *Rowell*, 17 Pick. 498; *Parsons* v. *Huff*, 38 Maine 137, and cases there cited; Phillips on Evidence, Cowen & Hill's notes, note 370; opinion of SARGENT, J., in *Jameson* v. *Blodgett* (unreported), Coös county, July T., 1869; *State* v. *Pike*, Rockingham county, June, 1869; *State* v. *Squires*, 48 N. H. 364; 1 Greenleaf Ev. 219, and citations. In view of the conflicting opinions upon this question in England, it was provided, in 1854, by a statute drawn mostly from the New York civil code, that if in the opinion of the court the witness was *adverse*, the party calling him could specially impeach him by showing that he had previously made different statements; and this is now the rule in all the English and Irish courts. Common Law Procedure Act, 17 and 18; Victoria C. 125, §§ 22, 103; N. Y. Civil Code, §§ 1845, 1849; *Dear* v. *Knight*, 1 Fost. & Fin. 433; *Pound* v. *Wilson*, 4 Fost. & Fin. 301; *Greenough* v. *Eccles*, 5 C. B. (N. S.) 786; Best on Evidence, 811.

The case of *Adams* v. *Wheeler*, 97 Mass. 67, is the latest American case holding the doctrine of the defendant. In that case the witness testified directly against the party calling her. The defendant then offered to show that she had stated differently the day before, which was not allowed. There was no affidavit of surprise, and no dispute but that the girl was the witness of the defendant upon the very point on which he proposed to impeach her testimony. The court there held

that the party who called the witness could not show that she had previously made different statements from those she made on the stand. But the injustice of this rule was so manifest, that the legislature hastened to change it by statute at their next session. Mass. Session Laws, 1870, chap. 393, sec. 4. In the case at bar, the testimony which the plaintiff sought to discredit in the minds of the jury was offered by Bellows as independent matter of defence ; and the fact that it was given by a witness who had previously been called by the plaintiff should not preclude him from discrediting it by any proper method in his power, even though it may incidentally impair the credibility of the witness himself. The cases cited in *Adams* v. *Wheeler* as sustaining the law there laid down, are none of them like this case. In *Brown* v. *Bellows,* 4 Pick. 194, and *Whitaker* v. *Salisbury,* 15 Pick. 544, the court simply decide that a witness is not to be directly impeached by the party calling him, on account of his *general* reputation for truth. But this is very different from holding that where a party has once, from necessity, placed upon the stand a witness summoned by the other side and known to be hostile to him, he has thereby made him his witness upon every point to which he may subsequently be called by the other party, in whose interest he really is. The cases of *Commonwealth* v. *Starkweather,* 10 Cush. 59; *Friedlander* v. *London Assurance Co.,* 4 B. & Ad. 193; *Regina* v. *Ball,* 8 C. & P. 745, and the other English cases cited in *Adams* v. *Wheeler,* are all of them cases where the party sought to specially impeach testimony which he had himself called forth. It is worthy of notice that neither in *Adams* v. *Wheeler,* nor in any of the American cases which it professes to, follow, is there the least examination or discussion of this question upon principle, or hardly even upon authority. And we submit that the doctrine of these cases is not in accordance with sound legal principles, or based upon correct legal reasoning. The authorities are uniform, that a party may impeach the general reputation of his adversary's witnesses, or specially impeach and discredit any particular portion of their testimony. Upon the question whether he can impeach and discredit any portion of the testimony of his own witness, which makes against him, there is much conflict.

The objections to allowing this to be done may be summed up as follows :

*First.* The danger that the jury will consider the contradictory evidence, not merely as *contradictory* evidence bearing upon the credibility of the witness, but as *substantive* evidence bearing upon the merits of the case.

*Second.* The danger of collusion,—i. e., that a person may be induced to make a *false* statement not under oath, out of court, for the purpose of contradicting by that statement the *truth,* which he must state when sworn as a witness in court.

*Third.* That a party ought not to be allowed to discredit his own witness ; that having placed him on the stand as a witness of credit, he shall not be allowed to show that he is not entitled to credit.

*Fourth.* That such evidence is not relevant, and has no proper bearing upon the question at issue.

The first objection applies with equal force to the contradiction of an *adverse* witness, which is always allowed. This objection is obviated by proper instructions from the court, whose duty it is to direct the jury to regard the contradictory testimony only as bearing upon the credibility of the witness, and not upon the merits of the case. The objection presupposes not only that the court will neglect this duty, but that the jury will consider evidence which is offered for one purpose only, as evidence for another purpose for which it is not offered, and to which it is applicable only as it *indirectly* bears upon it by showing the character of evidence bearing *directly* upon it; or it presupposes that the jury, having proper instructions from the court to consider the testimony only in the light in which it is offered, will, in spite of these instructions, and of their own will and motion, perversely and obstinately disregard their oaths by disobeying the instructions of the court, and doing an unreasonable and foolish thing. Further, if this objection is good for anything, it legitimately and logically excludes *all* contradictory testimony which does not bear directly upon the merits of the case, as well the contradiction of an adverse as of a favorable witness, of a witness upon the one side as upon the other. If the rule is to be placed upon this ground, we say that in all fairness and justice it should be made to apply to both sides of the case, and to *all contradictory evidence.*

In this case there is no claim that the jury were not properly instructed as to how they were to consider the contradictory affidavit introduced by the plaintiff, nor is there any suggestion that they did not consider it properly. After verdict it is to be presumed that the proper instructions were given by the court and followed by the jury. As to this objection, as well as to the second one (of the danger of collusion), it may be observed further, that the apprehension of possible danger from the admission of testimony is no ground for its exclusion. If the testimony will aid the court and the jury to ascertain the truth of the case, then the party has a right to have it considered. To say that if the evidence is admitted it will cause more harm than good, and should therefore be excluded, is in fact to usurp the province of the jury, and decide in advance how they will consider it and what weight they will give it. It is to be presumed that the jury will consider the evidence properly, reasonably, sensibly, according to the instructions of the court, and for the purpose for which it is offered, but there is always possible danger that they may not do so. It is impossible to obtain absolute certainty in any case, and the utmost that can be done is to decide which way the probabilities are. Is it more likely that the jury will consider the evidence for the purpose for which it is offered, and according to the instructions of the court, than for a purpose for which it is not offered, and contrary to the instructions of the court? Is it more likely that they will regard their official oaths and obey the instructions of the court, or that they will disregard them and disobey those instructions? The reasoning by which this objection is sustained, is of a piece with that by which it was formerly argued that the testimony of a party ought not to be received because

it was to be presumed that he would testify falsely.   It is assuming, as
a matter of law, that the jury will do that which they have taken a
solemn oath not to do.

The second objection is based upon the presumption that the wit-
ness and the party, or his attorney, will be guilty of a wicked and crim-
inal conspiracy to impair the weight of the testimony which the witness
is about to give.   This is harsh and unnatural, and contrary to the well
established rule of legal presumption that innocence is always to be
presumed, while guilt or a guilty intention must always be proved.  Best
on Presumptions, pp. 64, 65.   But this second objection, like the first,
if good for anything, excludes as well the contradiction of an adverse
as of a favorable witness ; for the witness might just as well make his
contradictory statement out of court to the party to whom he is favor-
able, and then, having tendered himself as a witness to the other side,
have the effect of his testimony on the stand destroyed by this previous
contradictory statement.   Against this far more dangerous stratagem
there is no rule of law, for a party may always impeach the testimony
of his adversary's witness, either specially or generally.  The objection
to this kind of reasoning, however, is, that you have no right to *presume
stratagem or collusion at all*, for the legal presumptions are all the other
way.

The third objection, that a party ought not to be allowed to discredit
his own witness, goes upon the ground that if the witness has stated
the matter differently at another time, he must necessarily have stated
a falsehood at one time or the other.   This objection is in reality but
an *extension* of the objections which lie against general, direct, and
necessary impeachment, by showing general bad character for truth, to
a *particular*, *incidental*, *and possible* impeachment by showing contradic-
tory statements.   The fallacy consists in considering the two cases as
identical in character, while they are really very dissimilar.

In one case the impeachment of the witness is the immediate, direct,
and necessary consequence of the course taken, the purpose being not
to show how much weight should be attached to a particular piece of
*testimony* given by the witness, but to show that the *witness* himself is
entitled to no credit upon any point.   In the other case the object is to
show the character of a particular piece of *testimony*, while the im-
peachment of the *witness* is only incidental, possible, contingent, and
may or may not happen, according as the jury, under all the circum-
stances of the case, conclude that the contradiction arises from mis-
recollection, wrong information, mistake, falsehood, or some other
cause.   To say that you may not show these contradictory statements
because it will impeach the witness, is to *assume* that the jury will regard
them as proof that he is a wilful liar, when they may just as well find
that he was mistaken, has forgotten, did not understand, or was not
understood by others.   It is to assume that to be *certain* to happen
which is entirely *contingent and uncertain.*

The objection is, that a party who has placed a person upon the stand
as a witness of credit, ought not afterwards to be allowed to say that he
is not a witness of credit.   Expressed in other words, it has been well

said to mean, simply, "that a party after giving credit to the witness for speaking the truth, shall not, although deceived by him, be allowed to show the deception." This is precisely what it must mean, for it is impossible to suppose a case, where a witness testifies contrary to his previous statement to the party calling him, where it is not certain that the party has been deceived by those statements; and though the deception may in some cases have been unintentional, still it is none the less a deception, and its consequences are none the less injurious to the party. Besides, the fact that the deception was unintentional may be shown, and the claim upon which this whole objection rests, viz., that the contradictory testimony will impeach the character of the witness for truth, would thus be entirely obviated. If the contradictory testimony does impeach the character of the witness, and shows him to be " a person not entitled to credit," it must be because the jury believe him to be a liar either when upon the stand, or when he made the contradictory statements; and hence, when you show that the contradiction arises from some other cause, and that the deception was unintentional, you remove the whole ground upon which this objection to special impeachment stands—that it affects the character of the witness, and does not in essence differ from general impeachment. It must come, then, to this,—that a party who has been *deceived* into giving credit to a witness for speaking the truth, shall not be allowed to show that deception. But we submit that a party does not, by calling a witness upon one point, vouch for him as entitled to credit upon every point to which he may be called in the case by anybody. He may know very little of the witness. He may even believe his character to be doubtful, and still properly believe that his statements upon the point to which he calls him are true. In such a case there is no reason for saying that the party or his attorney are practising a fraud upon the court, or asking the jury to give the witness any more credit than he is entitled to. The party calls the witness in good faith, relying upon his previous statements, believing that he will state the truth, and asking for his testimony the exact credit to which it is entitled. Now if the witness has deceived him, and testifies contrary to those statements, ought not the party to be allowed to show the deception, that the contradiction may be made manifest and the testimony weighed in the scales of truth? Suppose the contradiction does discredit the witness: if his testimony is unworthy of belief, ought not the jury to know it? The object of courts is to ascertain facts; and shall an arbitrary and technical rule of law shut out from their eyes the light which will guide them to a correct result? To insist upon this objection, is to sacrifice a party to a witness by whom he has been deceived. It is to say that, while you may always show the contradictory statements of your adversary's witness, and thus place his testimony fully and fairly before the jury, you cannot show contradictory statements of your own witness though he may have induced you to call him by the grossest deception and fraud. And yet there is no testimony against a party which tells so much in favor of his adversary as that which comes from a witness he has himself called.

For this reason, if for no other, it is much more important that a party should be allowed to show the contradictory statements of his own witness than those of his adversary. If the jury should conclude from the contradictory testimony that the witness was not to be believed upon that point, the other party could well claim that he was unworthy of belief upon any point, and thus the whole question of credibility would be left with the jury where it belongs. It is for them to decide whether the evidence discredits the witness or not. He may *deserve* to be discredited, and if so, it is the duty of the court to see that he is discredited, whether he is the witness of one party or of another. It is their duty to search out all matters which legitimately bear upon the merits of the case they are investigating, and to give the testimony of each witness the exact weight to which it is entitled.

But here we are met by the fourth objection, which is that such evidence does not legitimately bear upon the merits of the case. If this objection is good for anything, it necessarily excludes *all* such testimony, as well upon the one side as the other. For evidence of previous contradictory statements by an adversary's witness has no more direct bearing upon the merits of the case, than evidence of such statements by the witness of the party himself.

The *relevancy* of such testimony cannot be affected by the relations of the witness to the parties, though its *weight* may be. But the objection itself is not well taken, for such testimony bears directly and materially upon the credibility to which the testimony of the witness (which is itself relevant) is entitled. And the good sense of every one must dictate that there is no fact they would consider it of more importance to know in a case than whether a witness who gives material testimony before them has previously stated the matter differently. The rule of practice recognizes the relevancy of this kind of testimony, by admitting it when offered by a party against the witness of his adversary, and it is difficult to see how it can be less *relevant* when offered against his own witness. In *Dennett* v. *Dow*, 17 Me. 19, the court say, that while a direct impeachment of the party's own witness has been uniformly denied, an indirect impeachment has in certain cases been allowed, " because a direct impeachment affects general character, while an indirect impeachment only brings into question *the truth of the facts* to which the witness has testified." This, we submit, is the correct distinction, and if applicable in one case it must be in all, for the *truth of the facts* testified to is the important question in every judicial investigation. The special impeachment for which we ask tends simply to show the truth of those facts. If there is any impeachment of the character of the witness thereby, it is incidental, contingent, and remote, and does not follow any more necessarily in this case than when you show the fact to be otherwise by the testimony of other witnesses. And if a party who has called a witness is to be estopped from showing material facts concerning the testimony of that witness, on the ground that it may incidentally impair his character for truth, then he should also be estopped from showing the facts to be otherwise than the witness has stated by any testimony.

And yet the law is well settled that he may do this, even though it directly contradict and conclusively impeach the witness. *Adams* v. *Wheeler*, 97 Mass. 67. Now, putting aside the objection that the contradiction may be regarded as substantive evidence, which I have before considered, what is. the difference between discrediting the testimony of your witness by showing the fact to be otherwise than he states, by other testimony, and discrediting his testimony by showing that he has previously stated the fact differently? It comes to the same thing at last, *i. e.*, to how much weight should be given the testimony of the witness on that point. The reason urged against special impeachment, that the party by calling the witness has represented him as worthy of credit, &c., applies with as much force in one case as in the other. In both cases the testimony offered tends simply to impair the credit of the witness upon the particular point to which he has testified, affecting his general character only incidentally and collaterally; and one kind of testimony does not necessarily show moral turpitude more than the other.

As we have seen, the objections to special impeachment are but an *extension* of those which apply to general impeachment, and some of the authorities make one of the same objections to it, *i. e.*, that it would be a fraud upon the administration of justice to allow a party to put a witness on the stand as entitled to credit, and then show that he was not.

The distinction is, however, that while a party must be supposed to know the general character and reputation of his witness, he cannot be supposed to know that he will testify directly contrary to what he has assured him he would.

And while it may be a fraud upon the court for a party to ask them to believe a witness whom he knows to be unworthy of credit, it is a very different thing for him to ask them to believe one whom he believes himself. In one case, there is deception and concealment; in the other, innocence and frankness.

But if, as is claimed, it be a fraud upon the administration of justice, for a party who has been deceived by a witness to show that deception and explain why he placed him upon the stand, thus putting the *whole case* before the jury, what name shall we apply to that rule which compels an attorney, a sworn officer of the court, under a solemn oath to do no falsehood nor to consent that any be done in court, *and if he knows of any to bring the same to the knowledge of the court*, to sit quietly by listening to a witness, the evidence of whose falsehood he has in his possession, and do nothing to bring that evidence to the knowledge of the court? How shall we characterize a rule which thus compels a trusted officer of the court to become an unwilling party to such a gross fraud and outrage upon it? And yet this is the precise effect of the cases against which we argue.

By this rule, a party who has been entrapped and deceived by a dishonest and lying witness, is compelled to practice an unwilling, but none the less dangerous, fraud upon the court; and thus not only his interests, but what is of infinitely more importance than the interests

of any party, the cause of justice itself, is sacrificed to an unreasonable construction of the law.

This rule has never been adopted in this State, and if it is not based upon sound reason, the fact that it has received the sanction of other courts is no reason why it should be established here, for "The reason of the law is the life of the law, and whatever is not reason is not law."

Although this rule has been recognized by the decisions of other highly respectable tribunals, it is none the less the duty of this court to examine the foundations upon which those decisions rest, to try the rule by the touch-stone of legal reason, and ascertain whether it be sound or not. The law of jurisprudence, like that of all other sciences, is progress—a constant development—a continued growth, carrying into practice the principles upon which it is based, and adapting their application to the exigencies of the affairs of men. The highest plane of its condition to-day is but the stepping-stone to its condition to-morrow. Even constitutional law, in which are crystallized the principles that lie at the foundations of society, is *organic* law, possessing within itself the power of its own modification and growth; and the common law, by judicial exposition and construction, is fast modifying the harsh and arbitrary rules of evidence, adapting them to more enlarged views and more enlightened reason, while its obsolete and unreasonable doctrines are melting away beneath the gladsome light of an enlightened jurisprudence as the icebergs of the north dissolve and disappear amid the soft airs and wasting seas of the south.

It was once held that a party could not show the fact to be otherwise than had been stated by his witness; and it is interesting to notice that the same reasons were offered in support of that rule, which are now offered in support of the rule against which we argue. But in the progress of the science of the law this unreasonable rule was swept away; and, for the same reasons which led to this beneficial change, we now ask that this harsh and unreasonable rule should not be engrafted upon the jurisprudence of our State; that this relic of medieval jurisprudence, compelling both parties and courts to injustice and wrong, should not be made a part of the common law of New Hampshire.

Should such an unfortunate result ensue, we should often have occasion to exclaim that "justice was smothered in the folds of her own garments, crushed beneath the weight of her own cumbrous armor." *Wright* v. *Beckett*, 1 M. & R. 414; *Rex* v. *Oldroyd*, 1 R. & R., C. C. R. 88; *Ewer* v. *Ambrose*, 3 B. & C. 749; Phillips on Evidence, vol. 2, pp. 450–463; Starkie on Evidence, vol. 1, (*) 216–220; *Dunn* v. *Aslett*, 2 Moo. & Rob. 122; Greenleaf on Evidence, vol. 1, sec. 444; *Dennett* v. *Dow*, 17 Maine 19; *Brown* v. *Osgood*, 25 Maine 509; *Cowden* v. *Reynolds*, 12 Sug. & Rol. 281.

*Burns & Heywood*, for Bellows.

### BY THE COURT.

When the determination of the competency of a proposed piece of evidence involves a preliminary decision of any questions of fact by

the presiding judge, his decision on such matters of fact is final and not subject to exception. See *State* v. *Pike*, 49 N. H. 399 ; *State* v. *Squires*, 48 N. H. 364. In this case, evidence was presented to the judge upon which he might have found that the plaintiff was taken by surprise at the later testimony of Beard ; that there was no collusion between the plaintiff and the witness, nor any bad faith on the plaintiff's part ; and that the witness was adverse to the plaintiff. As the judge, after considering the evidence on these preliminary questions, allowed the plaintiff to prove the previous contradictory declarations of the witness, and reserved no question of fact, or of discretion, for our consideration, it is to be assumed that he found the facts to be as claimed by the plaintiff.

We are not now called upon to decide whether a party shall, in all instances, be allowed to prove the previous contradictory declarations of a witness whom he himself first called to the stand ; but only whether such declarations may be proved after it is established that the party calling the witness was surprised at his testimony, and was not guilty of collusion or of any bad faith, and that the witness was adverse to the party calling him. We think no exception lies to the ruling in this case.*

*Judgment on the verdict.*

---

* See *Ryerson* v. *Abingdon*, 102 Mass. 530, 531.          REPORTER.